IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

KRISTEN MARIE DODSON,
    Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,
    Defendant.

Case No. 1:14-cv-01321-JEH

**Order and Opinion**

Now before the Court is the Plaintiff's Kristen Dodson's Motion for Summary Judgment (Doc. 10), the Commissioner's Motion for Summary Affirmance (Doc. 13), and Dodson's Reply (Doc. 18). For the reasons stated herein, the Court GRANTS the Plaintiff's Motion for Summary Judgment, DENIES the Defendant's Motion for Summary Affirmance, and REMANDS this matter for additional proceedings consistent with this Order and Opinion.[1]

**I**

On February 11, 2011, Dodson filed an application for disability insurance benefits alleging disability beginning on May 6, 2010. Her claim was denied initially on July 18, 2011, and was denied upon reconsideration on January 5, 2012. On February 3, 2012, Dodson filed a request for hearing concerning her application for disability insurance benefits. A hearing was held before the Honorable David Thompson on December 18, 2012, and at that time Dodson was represented by an attorney. Following the hearing, Dodson's claim was denied

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 8) on the docket.

1

on January 25, 2013. Her request for review by the Appeals Council was denied on May 20, 2014, making the ALJ's Decision the final decision of the Commissioner. Dodson filed the instant civil action seeking review of the ALJ's Decision on August 13, 2014.

## II

### A

At the time she applied for benefits, Dodson was 35 years old living in Pontiac, Illinois in a home with her husband and three minor children. She was a high school graduate and mortuary school graduate and previously worked as a laboratory technician, a medical assistant, and a funeral director. While working as a lab technician/medical assistant on May 6, 2010, Dodson bent and squatted on her knees to get files out and when she got up she heard a pop and a pull in her right knee. Soon thereafter, it was determined via MRI that Dodson's right knee medial meniscus had a tear. On May 27, 2010, Dodson underwent a diagnostic arthroscopy with lateral release and a partial medial meniscectomy that was performed by her orthopaedic surgeon Dr. Mukund Komanduri, M.D. In September 2010, a repeat MRI showed that Dodson had a probable re-tear of the medial meniscus. On October 14, 2010, she underwent a second arthroscopic partial meniscectomy that was again performed by Dr. Komanduri. On March 18, 2011, Dr. Nikhil Verma, M.D., at Midwest Orthopaedics at Rush performed a meniscal transplant on Dodson's right knee. Finally, on March 12, 2012, Dodson underwent a right knee arthroscopy with intraarticular anterior fat pad debridement and plica excision and peroneal nerve decompression surgery.

At the hearing, Dodson testified that Dr. Verma put her at maximum medical improvement in June 2012 and explained that there was not a whole lot more that could be done for her right knee. Dodson testified that Dr. Verma restricted her to lifting no more than 7 and ½ pounds and standing or walking

intermittently for a total of less than two hours a day. She testified to a constant burning and tingling all the way down her right leg into her ankle and also residual right knee pain. She also explained that Dr. Verma told her to find a position where she could intermittently elevate her leg throughout the day as doing so was the only thing Dodson could do to get some relief from nerve and residual knee pain. Dodson testified that if she sat too long in a chair, her right leg and foot would start to feel like a lead weight and she would have to get up, move positions, walk around a bit, and elevate her leg above her heart to get rid of the burning and tingling.

Dodson testified that Dr. Komanduri put her on trial light duty return to work following each of her two surgeries that he performed on her right knee for a couple weeks "here or there" during 2010 and 2011. Dodson also testified that she took medications including Norco for pain relief, Xanax for mild depression, Ambien to sleep at night, Toprol to control her blood pressure, and Advil. She testified that the Norco made her sleepy and would sometimes upset her stomach and the Xanax gave her a "la-la feeling." AR 57.

In regard to daily activities, Dodson testified that she typically drove 15-20 miles per week, prepared light meals for her family, rinsed dishes and loaded them into the dishwasher, picked up little things around the house and dusted some things, occasionally vacuumed with a "little" vacuum, and grocery shopped on her own for just a few things. Dodson further testified that she drove her daughter to preschool two days a week and tried to read or watch TV during the day, though she found herself nodding off during the day either because she had little sleep the night before or because her pain medicine made her sleepy. She testified that she went out to visit somebody about twice every two weeks, and somebody would come to visit her about twice every two weeks.

Upon questioning by her attorney at the hearing, Dodson testified that since Dr. Verma released her at maximum medical improvement she was not pain free and had never been pain free since any of her surgeries. She explained that she had nerve issues that included burning and tingling from her right knee all the way down into her ankle, and that she asked Dr. Verma's partner, neurosurgeon Dr. Fernandez, for medication to try to help the nerve issues. Dodson stated that she tried Lyrica but that it did not work, and so Dr. Fernandez recommended a pain clinic for which Dodson was then awaiting his recommendation in order to attend one. Dodson testified that Dr. Verma's physician's assistant, Jamie, suggested that Dodson find a position which would allow her to elevate her leg, and Dodson's physical therapist also noted that elevation and ice helped her with her knee and nerve pain. Dodson also testified that her knee pain and nerve pain got worse since she was determined to be at maximum medical improvement in June 2012, and her pain was constant at a 5 to 6 out of 10. She stated that she was able to sleep for only 4 hours during the night soundly, and otherwise her sleep was restless. She testified that after doing some light chores around her home, her pain level would increase to an 8 or 9 and her right leg would feel fatigued.

The ALJ then questioned the Vocational Expert (VE) Alfred Walker. The ALJ asked the VE to assume an individual of Dodson's age, education, and experience who was limited to light work, occasionally operating foot pedals with the right lower extremity, and occasional postural activities with no ropes or scaffolds, and with the need to avoid frequent exposure to wetness, unprotected heights, and unprotected moving machinery. The VE testified that such an individual could still work as a laboratory technician and as a funeral director. The ALJ then asked the VE to assume an individual of Dodson's age, education, and work experience who was limited to sedentary work,

occasionally operating foot pedals with the right lower extremity, occasional postural activities with no ropes or scaffolds, and the need to avoid frequent exposure to wetness, unprotected heights, and unprotected moving machinery. The VE testified that Dodson's past work could not be performed with such restrictions. The VE also testified that none of the skills from Dodson's past relevant work would transfer to sedentary jobs. The VE testified that there were other jobs that such an individual could perform including ticket checker, telephone quotation clerk, and charge-account clerk.

      The ALJ then asked the VE to assume an individual of Dodson's age, education, and experience who had the following limitations: material handling limited to occasional floor to waist of 20 pounds, waist to shoulder of 25 pounds, and should to overhead of 20 pounds; occasional carrying of 30 pounds, occasional pushing of 18.5 pounds, and occasional pulling of 27 pounds; frequent material handling of floor to waist of 15 pounds, waist to shoulder of 17 pounds, shoulder to overhead of 15 pounds; frequent carrying of 15 pounds, frequent pushing of 9.25 pounds, and frequent pulling of 13.5 pounds; and constant material handling of floor to waist of 7.5 pounds, waist to shoulder of 8.5 pounds, and shoulder to overhead of 7.5 pounds; constant carrying of 7.5 pounds; occasional standing, walking, squatting, climbing, and kneeling; and frequent sitting, bending, reaching, and gripping. The ALJ asked the VE how such restrictions would affect the performance of Dodson's past relevant work. The VE responded that the individual could still do light strength work, including laboratory technician and funeral director. The ALJ asked the VE to assume such an individual with the added restriction of the need to occasionally elevate the right lower extremity to between 8 and 10 inches. The VE explained that such a limitation would preclude light strength work but that sedentary work would still be available for such an individual.

The VE also testified that an individual who missed four or more days of work per month could not maintain competitive employment. The VE testified that an individual who needed to take extra breaks so that the individual would be away from her work station for periods of time in addition to regular breaks and allowed lunch periods such that she was less than 80% productive on the job could not maintain full time competitive employment. Finally, at the conclusion of the VE's testimony, Dodson's attorney made a brief statement as to why Dodson was entitled to a favorable decision and that she was simply not capable of performing a full range of sedentary work.

### B

In his Decision, the ALJ found that Dodson had the severe impairments of status-post meniscal transplant and disorders of the muscle, ligament, and fascia. The ALJ made the following RFC finding:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except material handling limited to occasional floor to waist at 20 pounds, waist to shoulder, 25 pounds, and shoulder to overhead, 20 pounds; limited to occasional carrying 30 pounds; occasional pushing limited to 18.5 pounds, limited to occasional pulling at 27 pounds; limited to frequent material handling floor to waist, 15 pounds, waist to shoulder, 17 pounds, shoulder to overhead, 15 pounds, limited to frequent carrying 15 pounds, limited to frequent pushing, 9.25 pounds, Limited [sic] to frequent pulling, 13.5 pounds, Limited [sic] to constant material handling floor to waist, 7.5 pounds, waist to shoulder, 8.5 pounds and shoulder to overhead, 7.5 pounds, Limited [sic] to constantly carrying 7.5 pounds; Limited [sic] to occasional standing, walking, squatting, climbing and kneeling; Limited [sic] to frequent sitting, bending, reaching and gripping; Needs [sic] to occasionally elevate right lower extremity to between 8 to 10 inches.

AR 34. In making that finding, the ALJ detailed Dodson's daily activities and listed the prescriptions she was taking and the fact that she testified to no side

effects.[2] The ALJ also discussed treating physician Dr. Verma's notes regarding Dodson's ability to work at various times and any necessary work restrictions for her. Specifically, the ALJ cited Dr. Verma's statement that a seated position was recommended for Dodson but if no such position were available, that she remain off work. Dr. Verma also encouraged Dodson to find a position where she would be allowed to intermittently elevate her leg throughout the day. The ALJ cited treating physician Dr. Komanduri's notes, MRI results in September 2011, the examination results following the arthroscopy in March 2012, and a June 2012 functional capacity evaluation (FCE). He recited Dr. Verma's December 2012 note that Dodson continue work per the guidelines outline in the FCE and that she was encouraged to find a position where she was allowed to intermittently elevate her leg throughout the day. The ALJ detailed Dodson's attempts to return to work after her surgeries and how she experienced exacerbations of her pain and swelling when she did so. The ALJ also discussed the state agency physicians' opinions, noting that they did not have the benefit of the additional medical evidence and other evidence of record.

     Elsewhere in the opinion, the ALJ identified the four separate surgeries Dodson underwent on her right knee between May 2010 and March 2012. He discussed MRI and EMG test results during that time span, the treatments Dodson receiving including physical therapy and a Synvisc injection, the progress physical examination of Dodson showed after the surgeries, right quadricep atrophy and antalgic gait that was noted from time to time, Dodson's efforts at attempting to return to her previous work at various times, and Dodson's complaints of pain. The ALJ further detailed Dodson's June 2012 FCE, including recommendations regarding lifting, standing, walking, reaching, etc.,

---

[2] As Dodson points out in her Motion for Summary Judgment and as her testimony recited earlier in this Order and Opinion indicate, Dodson *did* complain of some side effects.

and Dodson's physical therapist's note when Dodson was discharged from therapy in 2012.

In regard to Dodson's credibility, the ALJ stated:

> The claimant's allegations of total inability to work are inconsistent with the objective medical findings noted above, her intermittent work activity, and her daily activities including caring for her children and light household chores. Her testimony therefore is not fully credible regarding such allegation, but essentially is consistent with the highly restricted RFC noted above.

AR 35. The ALJ later explained, in rejecting the state agency physicians' opinions where they did not have the benefit of the current record, that the medical evidence supported the physical and mental limitations indicated in the RFC and he gave Dodson "all benefit of reasonable doubt." AR 36.

### C

Upon her appeal to the Appeals Council (AC), Dodson submitted additional evidence that was not previously before the ALJ. The new evidence consisted of treatment notes from Dr. Joel See, M.D., dated January 7, 2013 through January 11, 2013 and February 15, 2013 to March 20, 2013. In the Order of Appeals Council, the AC explained that it had "received additional evidence which it is making part of the record." AR 13. The AC listed that additional evidence which included Dr. See's treatment notes, Exhibits 20F and 21F, from January to March 2013. In those notes, Dr. See discussed the plan for Dodson to try some new treatments to deal with her pain, and he diagnosed Dodson with chronic post-operative pain, complex regional pain syndrome, and reflex sympathetic dystrophy of the foot. AR 698, 713, 717.

In the Notice of Appeals Council Action, the AC explained that it considered "the additional evidence listed on the enclosed Order of Appeals Council." AR 9. The AC further explained that, "We considered whether the

Administrative Law Judge's action, findings, or conclusion is contrary to the weight of evidence of record," and that it "found that this information does not provide a basis for changing the Administrative Law Judge's decision." AR 10.

### III

Dodson makes three arguments: 1) the ALJ's assessment was incomplete where he failed to assess Dodson's RFC for the entire period at issue and inadequately accounted for Dodson's need to elevate her leg and alternate positions during the period he did consider; 2) the ALJ's credibility assessment was "patently wrong" where his reasoning is not supported by substantial evidence and he failed to consider all of the regulatory factors; and 3) remand is warranted where the AC erroneously found new evidence submitted to it was not "material."

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. See *Schmidt v Apfel*, 201 F3d 970, 972 (7th Cir 2000); *Pugh v Bowen*, 870 F2d 1271 (7th Cir 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 USC § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v Barnhart*, 297 F3d 589, 593 (7th Cir 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v Bowen*, 782 F2d 79, 82 (7th Cir 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v Perales*, 402 US 389, 390 (1971), *Henderson v Apfel*, 179 F3d 507, 512 (7th Cir 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally

disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. See 20 CFR §§ 404.1566, 416.966 (1986). The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 USC § 1382(c)(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v Califano*, 614 F2d 142, 143 (7th Cir 1980). The factual determination is made by using a five-step test. See 20 CFR §§ 404.1520, 416.920. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of her impairments is severe;

3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4) is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5) is unable to perform any other work existing in significant numbers in the national economy.

Id. An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at

any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v Schweiker*, 732 F2d 605 (7th Cir 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v Heckler*, 779 F2d 1250 (7th Cir 1985); *Halvorsen v Heckler*, 743 F2d 1221 (7th Cir 1984).

In the instant case, Dodson claims error on the ALJ's part at Step Four and error on the AC's part upon appeal.

### A

The ALJ's Decision as it pertains to his RFC finding and credibility finding is adequately supported by the evidence of record. The ALJ provided "enough detail and clarity to permit meaningful review." *Arnett v Astrue*, 676 F3d 586, 592 (7th Cir 2012). Though the Plaintiff's Motion delineates very particular errors the ALJ allegedly committed, when read as a whole, the Decision builds a logical bridge between the evidence and the ALJ's RFC and credibility findings. See *Rice v Barnhart*, 384 F3d 363, 369 (7th Cir 2004) (stating that the ALJ must have built a logical bridge from the evidence to his conclusion, but that the ALJ's opinion will be read with a commonsensical reading than nitpicking it).

However, remand is warranted based upon the AC's error on appeal as set forth below.

### B

Dodson argues that the evidence she submitted to the AC, while correctly considered, was incorrectly found to be immaterial. She argues that it is material for three reasons: 1) the evidence corroborates her testimony that her condition had deteriorated since the FCE; 2) the evidence undermines the validity of the FCE results; and 3) Dr. See's opinion that she cannot work full-time as a result of

11

pain underscores how incomplete the ALJ's RFC assessment was and shows that Dodson is and has been disabled since the 2010 injury to her right knee. The Commissioner counters that the AC's order is not reviewable and there is no evidence that warrants remand under Sentence Six. The Commissioner argues that Agency guidelines provide that the AC will exhibit evidence that it receives only after concluding that the evidence is new and material and relates to the period at issue. Thus, the Commissioner argues that by listing the additional evidence Dodson submitted as exhibits, the AC reached the conclusion that the evidence was new, material, and related to the period on or before the date of the ALJ's Decision. The Commissioner argues further, therefore, that the AC's denial of review is not judicially reviewable.

Included in the AC Exhibits List are records from Dr. See dated January 7, 2013 to March 20, 2013. AR 12-13. The AC Notice explains:

> In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council.
> We considered whether the Administrative Law Judge's action, findings, or conclusion is contrary to the weight of evidence of record.
> We found that this information does not provide a basis for changing the Administrative Law Judge's decision.

AR 9-10.

20 CFR § 404.970(b) provides:

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the

> administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

The Social Security Administration's internal Hearings, Appeals, and Litigation Law Manual (HALLEX) at I-3-3-6 states that new and material evidence is:

> 1. Not part of the claim(s) record as of the date of the ALJ decision;
> 2. Relevant, i.e., involves or is directly related to issues adjudicated by the ALJ; and
> 3. Relates to the period on or before the date of the ALJ decision, meaning it is: (1) dated before or on the date of the ALJ decision, or (2) post-dates the ALJ decision but is reasonably related to the time period adjudicated by the ALJ.

The Seventh Circuit's recent case of *Stepp v Colvin* guides the Court's analysis in this case because *Stepp* analyzed the very issue argued by the parties in this case. 795 F3d 711 (7th Cir 2015). In *Stepp*, the claimant argued that the evidence submitted to the AC following the ALJ's decision merited remand for additional consideration of "new and material" evidence that the AC allegedly declined to review. Id at 718. The *Stepp* court explained that its ability to review the AC's decision was dependent upon the grounds on which the AC declined to grant plenary review. Id at 722. Just as in this case, the Commissioner insisted that the AC accepted the specific evidence as new and material, thus rendering the AC's decision "discretionary and unreviewable." Id. Also just as in this case, the AC's denial notice in *Stepp* used the standard boilerplate language that it "had considered . . . the additional evidence . . . [and] found that this information d[id] not provide a basis for changing the [ALJ]'s decision." Id at 723. The Commissioner in *Stepp* further argued, as she does here, that the inclusion of the evidence at issue in the list of exhibits conclusively established that the AC deemed those notes new and material. Id at 724. Finally, the Commissioner argued that the statement in the claimant's AC denial notice that the AC

"considered whether the [ALJ]'s action, findings, or conclusion is contrary to the weight of evidence of record," made clear that the AC found the claimant's newly submitted evidence to be qualifying and proceeded to evaluate whether it was sufficient to require de novo review of the ALJ's unfavorable decision. Id.

The *Stepp* court was not persuaded by the Commissioner's arguments. It first reasoned that the language of the denial notice left unclear whether the AC found the relevant evidence to be new and material. Id. Next, the *Stepp* court determined that the inclusion of the evidence on the exhibit list was insufficient to persuade the court that the AC had accepted the newly submitted evidence as new and material. Id. Last, the inclusion of language that the AC considered whether the ALJ's action, findings, or conclusions was contrary to the weight of the evidence of record was "boilerplate language . . . little more informative than the similarly standardized language employed by the Council in *Farrell* [*v Astrue*], which explained that the "information [submitted to the Appeals Council] d[id] not provide a basis for changing the [ALJ]'s decision." Id, citing *Farrell v Astrue*, 692 F3d 767 (7th Cir 2012). That boilerplate language was not sufficiently specific to confirm that the AC had accepted and reviewed the newly submitted evidence. Id at 724-25. The *Stepp* court concluded that it could not "conclude that these abstruse signals, without more, demonstrate that the Council considered [the relevant new] treatment notes." Id at 725. It therefore interpreted the AC's decision as stating that it had rejected the claimant's new evidence as non-qualifying under the regulation. Id. Accordingly, the *Stepp* court reviewed de novo the AC's determination that the new evidence did not qualify as "new and material" under 20 CFR § 404.970(b) and concluded that the determination amounted to legal error. Id.

Here, the AC's denial notice suffers from the same defects highlighted in *Stepp*. Thus, this Court also interprets the AC's determination in this case as

14

stating that it rejected Dodson's new evidence as non-qualifying under the regulation, and this Court undertakes a de novo review of the AC's determination that the evidence was not "new and material."[3]

It appears that the parties are in agreement that the AC considered Dr. See's treatment notes as "new," given the fact that Dodson limits her argument to the AC's alleged failure to find those treatment notes "material." In any event, it is undeniable that Dr. See's treatment notes qualified as "new" where they were "not in existence or available to the claimant at the time of the administrative proceeding." *Perkins v Chater*, 107 F3d 1290, 1296 (7th Cir 1997). The parties also do not dispute that Dr. See's notes are time-relevant. The ALJ's Decision is dated January 25, 2013 and Dr. See's treatment notes are dated January 7, 2013 to March 20, 2013. Dr. See's treatment notes are clearly time-relevant where they pre-date the ALJ's Decision and post-date it by less than two months. See HALLEX I-3-3-6.

Dr. See's treatment notes are also "material." Integral to the ALJ's finding that Dodson was capable of performing sedentary work as articulated in the RFC was his review of treating doctors' indications that Dodson could return to work, albeit at a more restricted level than she was working before her May 2010 injury, and specifically his citation to Dr. Verma's concurrence with the restrictions provided in the June 2012 FCE. Also integral to the ALJ's non-disability finding was that the RFC "represents the claimant's abilities *after recovery time from her multiple surgeries*." AR 35 (emphasis added). Dr. See's treatment notes discuss Dodson's abilities in that period "after recovery time" – less than one month before the date of the ALJ's Decision. In other words, Dr. See's treatment notes provide a more current picture of Dodson's abilities as of the date of the ALJ's

---

[3] The Court's consideration of the new evidence, however, is limited to that from Dr. See because that is the only evidence Dodson explicitly discusses in her Motion for Summary Judgment.

Decision on January 25, 2013.  Just as the *Stepp* court found, this Court finds that given this persuasive evidence that Dodson "was not, in fact, on an upward trajectory at the end of the adjudicative period," this matter must be remanded to the ALJ to re-evaluate Dodson's RFC in light of the information presented in Dr. See's notes.  See *Stepp*, 795 F3d at 726 ("Given this persuasive evidence that Stepp was not, in fact, on an upward trajectory at the end of the adjudicative period, we remand the case to the ALJ to re-evaluate Stepp's RFC in light of the information presented in [the new evidence]").

## IV

For the foregoing reasons, the Dodson's Motion for Summary Judgment (Doc. 10) is GRANTED, the Commissioner's Motion for Summary Affirmance (Doc. 13) is DENIED, and this matter is remanded to the Social Security Administration pursuant to the fourth sentence of 42 USC § 405(g) for further proceedings consistent with this Order and Opinion.

*It is so ordered.*

Entered on October 1, 2015.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE